UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARILYN MADORSKY, Individually
and on behalf of other similarly situated,

                                  Case No. 11-12662

             Plaintiffs,

                                  Paul D. Borman
v.                                    United States District Judge

SPIRIT AIRLINES, a Delaware Corporation,

             Defendant.

_____/

OPINION AND ORDER GRANTING IN PART DEFENDANT'S
MOTION FOR JUDGMENT ON THE PLEADINGS (ECF NO. 34)

      This matter is before the Court on Defendant's Motion for Judgment on the Pleadings. (ECF No. 34.) Plaintiff filed a Response (ECF No. 38) and Defendant filed a Reply (ECF No. 43). The Court held a hearing on November 1, 2012. For the reasons that follow, the Court GRANTS IN PART Defendant's Motion for Judgment on the Pleadings.

**INTRODUCTION**

      This action involves Plaintiff's proposed class action claims challenging certain terms and conditions of membership in Defendant Spirit Airlines' ("Spirit") $9 Fare Club (the "Club"). Plaintiff claims that Spirit's automatic fee increase policy for continued membership in the Club, coupled with the policy for cancelling membership in the Club, operates to deprive members who have cancelled their memberships from receiving the benefits of the Club, i.e. the ability to purchase tickets at a discount, for which they have already paid a full annual fee. Plaintiff proposes a Nationwide class of persons who have cancelled membership in the $9 Fare Club, seeking rescission

and restitution and damages under the Florida Deceptive and Unfair Trade Practices Act. Plaintiff proposes a separate sub-class of Michigan consumers seeking damages under the Michigan Consumer Protection Act.

Spirit now moves for judgment on the pleadings, arguing that Plaintiff's Florida unfair trade practices claim and Michigan consumer protection act claim are preempted by the Airline Deregulation Act. Spirit argues that, even failing a finding of preemption, the Court should dismiss Plaintiff's consumer protection and deceptive trade practices claims for failure to establish the requisite fraud and/or deceptive conduct. Finally, Spirit argues that Plaintiff's have failed to allege the requisite elements of a claim for rescission.

## I.      BACKGROUND

### A.      The Terms and Conditions of Membership in the $9 Fare Club

Plaintiff's Class Action Complaint involves allegations regarding Spirit's $9 Fare Club (the "Club"), a "discount flight ticket club," which members pay an annual fee to join. (ECF No. 31, First Amended Class Action Complaint ¶ 16 (the "FAC")). The $9 Fare Club Terms and Conditions (the "Terms and Conditions"), provide that membership in the Club is conditioned on the member's agreement to the Terms and Conditions, which is deemed to have occurred when a member enrolls in the Club. (ECF No. 34, Def.'s Mot. Ex. A, Preamble.)[1] The Terms and Conditions further

---

[1] Plaintiff argues that the 2011 Terms and Conditions attached to Spirit's Motion as Exhibit A are "not the operative Form for 2010 when Plaintiff alleges she enrolled." (ECF No. 38, Pl.'s Resp. 1 n. 1.) Plaintiff further states that "nothing in the pleadings shows that the 2011 and 2010 forms are otherwise identical." *Id*. Notably, Plaintiff did not attach the 2010 Form that she claims was in effect when she enrolled, and she referred throughout her response brief to the "the contract form (Spirit's Exhibit A)," the 2011 Form, when describing the allegedly unconscionable terms of her agreement with Spirit.

On October 29, 2012, this Court ordered Defendant to provide to the Court a copy of the 2010 Terms and Conditions that were in effect when Plaintiff claims to have enrolled in the $9 Fare

provide that a member may cancel membership in the Club at any time, either online or in writing. (*Id*. Section 1.3.) The Terms and Conditions further provide that "Club Members will have access to book special fares on Spirit not available to non-members." (*Id*. Section 2.1.) Upon Annual Enrollment, each member is presently charged a fee of $59.95. The enrollment fee is non-refundable, even if a member cancels membership in the Club. One year after enrollment in the Club, and on each anniversary thereafter, members will automatically be charged an annual fee of $59.95. The Terms and Conditions provide that the annual fees are non-refundable, again notwithstanding a member's cancellation of membership in the Club. (*Id.* Sections 3.1, 3.3, 3.5.)

Both the initial enrollment membership fee and the renewal membership fee are subject to change by Spirit "at any time without notice to the member." (*Id*. Section 3.6.) Any increase in fees takes effect upon the renewal date of the membership. Members are never entitled to a refund of membership fees upon cancellation of membership in the Club. Once a member cancels, membership cannot be reinstated and a member must re-enroll to begin receiving Club benefits. (*Id*. Sections 3.7, 3.8.) The Terms and Conditions further state that memberships will be automatically

---

Club. (ECF No. 44.) In response, Defendant filed an affidavit attaching a version of the 2010 Terms and Conditions and explaining that the only changes to the Form between 2008 and 2011 were the increase in the membership fee from $39.95 to $59.95, the change of all references to $9 to $19.95 and the change of the term "passenger" to "customer," in both English and Spanish. (ECF No. 45, October 31, 2012 Affidavit of Cameron Trent.) The Affidavit explained that Spirit did not retain copies of the various versions of the Terms and Conditions that have been posted online each year since 2008, and produced only an archived copy of the 2010 Terms and Conditions, along with sworn testimony informing the Court of all changes to that document that Spirit claims to have made since 2008. However, at the hearing on this matter Plaintiff, for the first time, attempted to proffer copies of letters that she alleges she received from Spirit that Plaintiff apparently intends to allege modified the contract between the parties in some relevant manner. Because the Court is not dismissing at this time Plaintiff's claim for rescission based upon the provisions of the Terms and Conditions, the Court need not delve into this factual moray at this time.

renewed upon expiration of the annual period if a member has not cancelled prior to their renewal date.  The Terms and Conditions expressly provide that these automatic renewal charges will be assessed to any credit card on file and that Spirit is not obligated to inform members of prior to charging the annual fee on a member's credit card.  (*Id*. Section 4.1.)   Memberships are twelve months in duration.  (*Id*. Section 4.4.)  Spirit reserves the right to amend the Terms and Conditions by posting changes on its website and any changes to the Terms and Conditions become effective 30 days after they are initially posted on the site.  (*Id*. Section 7.)  Finally, the Terms and Conditions provide the terms of membership shall be governed and construed in accordance with Florida law and that any dispute between members and Spirit will be resolved by arbitration conducted in Broward County, State of Florida.  (*Id*. Section 9.5.)  The choice of law provision provides that "[n]otwithstanding the foregoing, nothing in this Agreement is intended or shall be construed to negate or otherwise affect the consumer protection laws of the state in which the Members reside." *Id*.

###   B.   Plaintiff's Claims

Plaintiff claims that under the Terms and Conditions of Club membership, a member has an unreasonably small window of time within which to cancel his or her membership after learning of an annual fee increase, which can be very substantial (increasing from $39.95 in 2010 to $59.95 in 2011). (FAC ¶¶ 3, 4.) Plaintiff states that unless the member visits the website regularly or receives an email notice regarding a fee increase, the member will be unaware that the fee has increased and their credit card on file with Spirit will be automatically charged the increased amount without their knowledge. *Id*. ¶ 5.  A member who becomes aware that they have been charged an increased fee and attempts to cancel after the automatic renewal fee has been charged and a new year of

4

enrollment in the Club has begun cannot, as explained in the Terms and Conditions, receive a refund.  Moreover, as explained in the Terms and Conditions, immediately upon cancellation, the member's benefits immediately cease so that they will be unable to qualify for discount fares even though they may have been charged the annual fee for the upcoming year.  *Id.* ¶ 6.  Although a member who is aware of and wishes to avoid the fee increase does have a window of time to cancel their membership prior to the automatic charge to their credit card on the renewal date, Plaintiff complains that members like herself who only learn about the fee increase when they receive their credit card statement after the fee has been charged and then attempt to cancel, lose an entire membership year of benefits for which they have already paid the new increased annual fee.  *Id.* ¶¶ 6-7.

Plaintiff alleges that the Club Agreement is procedurally and substantively unconscionable because members like Plaintiff, who cancelled their membership after learning that they had been charged the increased annual fee, have fully paid for 365 days of benefits in the Club, i.e. the ability to access steeply discounted fares not available to non-members, but having cancelled in fact lose those benefits and cannot access discounted fares.  *Id.* ¶ 13.

Plaintiff also alleges that Spirit gave "discretionary" refunds to thousands of consumers while enforcing the no-refund policy against thousands of others, like Plaintiff.  *Id.*  Plaintiff also alleges that the provision of the Terms and Conditions requiring arbitration of disputes in Florida is unconscionable.  *Id.*  The FAC summarizes the essence of Plaintiff's claim as follows:

> Whereas Defendant does include in its online "Terms and Conditions" the statement that membership fees are non-refundable, Defendant does not explain anywhere that it will retain the full payment covering time into the future for the balance of the entire membership year while at the same time immediately barring the cancelling member from participating in any of the benefits for which the member already has paid; This is a brazen consumer fraud, and if adequately disclosed, a typical

> consumer acting reasonably would not consent under such circumstances to entering into a contract under which he/she is subject to being automatically charged an unknown future rate increase (especially 50% increase per year).

*Id*. ¶ 15.  In a somewhat unrelated vein, Plaintiff alleges that Spirit "concealed from consumers extensive negative material facts about the conduct of its business," including the fact that "according to the Better Business Bureau of SE Florida Defendant far exceeds all other airlines in numbers of consumer complaints."  *Id*. ¶ 16.

On behalf of herself and a proposed class of "all persons who . . . have cancelled membership in the Spirit Airlines $9 Fare Club," Plaintiff seeks rescission and restitution (Count I), damages under the Michigan Consumer Protection Act (Count II as to a subclass of Michigan consumers), and  damages under the Florida Deceptive Trade Practices Act (Count III).

## II.    STANDARD OF REVIEW

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is governed by the same standards applicable to a motion to dismiss pursuant to Rule 12(b)(6). "[T]he legal standards for adjudicating Rule 12(b)(6) and Rule 12(c) motions are same . . . ." *Lindsay v. Yates*, 498 F.3d 434, 437 n. 5 (6th Cir. 2007).  The Sixth Circuit has defined the pleading requirements necessary to withstand a challenge under Rule 12(c):

> We recently explained the pleading requirements that are necessary to survive a Rule 12(c) motion:
>
> In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.... Factual allegations must be enough to raise a right to relief above the speculative level...." *Id*. at 1964-65 (internal citations omitted).  In *Erickson v. Pardus*, 550 U.S. ----, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), decided two weeks after *Twombly*, however, the Supreme Court affirmed that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to

> relief.' Specific facts are not necessary; the statement need only 'give the defendant
> fair notice of what the ... claim is and the grounds upon which it rests.'" *Id*. at 2200
> (quoting *Twombly*, 127 S.Ct. at 1964). The opinion in *Erickson* reiterated that "when
> ruling on a defendant's motion to dismiss, a judge must accept as true all of the
> factual allegations contained in the complaint." *Id*. (citing *Twombly*, 127 S.Ct. at
> 1965). We read the *Twombly* and *Erickson* decisions in conjunction with one another
> when reviewing a district court's decision to grant a motion to dismiss for failure to
> state a claim or a motion for judgment on the pleadings pursuant to Federal Rule of
> Civil Procedure 12. *Sensations, Inc*., 526 F.3d at 295-96 (footnote omitted).

*Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 550 (6th Cir. 2008) (quoting *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008)).

When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id*. (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)). "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Term. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id*. at 555 (internal citations omitted). Dismissal is appropriate if the plaintiff has failed to offer sufficient factual allegations that make the asserted claim plausible on its face. *Id*. at 570. The Supreme Court clarified the concept of "plausibilty" in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009):

> To survive a motion to dismiss, a complaint must contain sufficient factual matter,
> accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

*Id*. at 1948-50. A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 127 S.Ct. at 1969).

In ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint or that are central to plaintiff's claims (2) matters of which a court may take judicial notice (3) documents that are a matter of public record and (4) letters that constitute decisions of a government agency. *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 2499, 2509 (2007). *See also Greenberg v. Life Ins. Co. Of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed to form a part of the pleadings). Where the claims rely on the existence of a written agreement, and plaintiff fails to attach the written instrument, "the defendant may introduce the pertinent exhibit," which is then considered part of the pleadings. *QQC, Inc. v. Hewlett-Packard Co*., 258 F. Supp. 2d 718, 721 (E.D. Mich. 2003). "Otherwise, a plaintiff with a legally deficient claims could survive a motion to dismiss simply by failing to attach a dispositive document." *Weiner v. Klais & Co., Inc*., 108 F.3d 86, 89 (6th Cir.

8

1997).

## III.  ANALYSIS

Spirit moves for judgment on the pleadings, claiming that Plaintiff's statutory deceptive trade practices and consumer protection claims are pre-empted by the Airline Deregulation Act, 49 U.S.C. § 41713(b)(1), (the "ADA").  Spirit further argues that Plaintiff's FAC fails to state a claim for rescission and, if the Court concludes that Plaintiff's consumer protection and deceptive practices allegations are not preempted, they also fail to state a claim.

### A.  Preemption Under the ADA

The Supreme Court has directly addressed the preemption provisions of the ADA in two pertinent decisions.  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) and *American Airlines v. Wolens*, 513 U.S. 219 (1995).  In *Morales*, the Court was called upon to decide "whether enforcement of the [National Association of Attorneys General] NAAG guidelines on [airline] fare advertising through a State's consumer protection laws is pre-empted by the ADA."  504 U.S. at 382.  Construing the express provision of the ADA that preempts States from "enact[ing] or enforc[ing] any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any carrier," the Court interpreted the phrase "relating to" broadly, concluding that all "State enforcement actions having a connection with or reference to airline "rates, routes, or services" are pre-empted under [the ADA]."  504 U.S. at 384.  The Court insisted that the grant was broad despite the legislature's retention of a savings clause in the ADA which preserves "remedies now existing at common law or by statute," reasoning that "[a] general "remedies" saving clause cannot be allowed to supersede the specific substantive pre-emption provision . . . ."  *Id.* at 385.  The Court rejected the notion that only those state laws expressly

9

addressed to the airline industry were pre-empted, holding that the fare advertising provisions adopted by the National Association of Attorneys General (the "NAAG guidelines"), which state attorneys general were attempting to enforce against airlines through consumer protection laws in several states, were pre-empted by the ADA. *Id*. at 390.

The Court in *Morales* did limit its holding to the price aspects of fare advertising, concluding that "[s]ome state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner" to have pre-emptive effect." *Id*. at 390 (quoting *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 100, n. 21 (1983)).  The Court concluded by noting that its "decision does not give the airlines *carte blanche* to lie and deceive consumers; the DOT retains the power to prohibit advertisements which in its opinion do not further competitive pricing." *Id*.  Several of the NAAG Guidelines that the attorneys general sought to enforce through the state consumer protection laws imposed obligations that restricted the airlines' ability to advertise lower, discounted fares, such as requiring that fares be available in sufficient quantities or on specifically defined bases.  504 U.S. at 394-96 (Appendix to Opinion of the Court, NAAG Guidelines).  The Guidelines also sought to control the terms and conditions of frequent flyer programs, specifically requiring "adequate notice" of how the programs could change prospectively or adequate disclosures of the potential for the "imposition of other restrictions which may result in the airlines' unilateral devaluation of awards." *Id.* at 397-98.  The Court found that, given the business model of the airline industry which requires an airline to maximize its sale of high price seats while at the same time advertising its discount seats to fill aircrafts, many of these restrictions, which the attorneys' general sought to enforce through state consumer protection laws, clearly "had an impact upon the fares that they charge," and therefore were preempted by the ADA. *Id*.

In a subsequent Supreme Court decision directly addressing preemption under the ADA, *Wolens*, *supra*, plaintiffs were members in American Airlines' Advantage Club, through which enrolled members earned mileage credit when flying on American.  513 U.S. at 224.  Advantage Club members could exchange accrued mileage credit for flight tickets or for upgrades in class-of-service.  *Id*.  Plaintiffs claimed that American Airlines retroactively devalued their earned mileage credits by adopting restrictions on utilization of those credits that imposed black out dates and capacity controls (the number of award-eligible seats on any given flight).  Plaintiffs claimed that the retroactive application of these new restrictions, which decreased the purchasing power of mileage credits they had accrued when no such restrictions were in place, violated the Illinois Consumer Fraud and Deceptive Business Practices Act.  *Id*. at 225.

In *Wolens*, the Supreme Court first addressed the question of whether plaintiffs' complaint stated claims "relating to [air carrier] rates, routes, or services," concluding that *Morales* clearly instructed that they did:  "Plaintiffs' claims relate to "rates," *i.e.*, American's charges in the form of mileage credits for free tickets and upgrades, and to "services," *i.e.*, access to flights and class-of-service upgrades unlimited by retrospectively applied capacity controls and blackout dates."  513 U.S. at 227.  The Court then turned to the question of whether permitting plaintiffs' claims to proceed would amount to "enactment" or "enforcement" by the State of Illinois, so that Plaintiffs' consumer fraud and breach of contract claims were preempted under the ADA.  First examining the consumer fraud and deceptive practices statute under which Plaintiffs brought their claims, the Court held that Plaintiffs' claims under those statutes were clearly preempted:

> [T]he Consumer Fraud Act serves as a means to guide and police the marketing practices of the airlines; the Act does not simply give effect to bargains offered by the airlines and accepted by airline customers.  In light of the full text of the preemption clause, and the ADA's purpose to leave largely to the airlines

11

themselves, and not at all to the States, the selection and design of marketing mechanisms appropriate to the furnishing of air transportation services, we conclude that § 1305(a)(1) preempts plaintiffs' claims under the Consumer Fraud Act.

513 U.S. at 228.

The Court in *Wolens* reached a different conclusion with respect to plaintiffs' breach of contract claim, which was based not on a "state-imposed obligation[]," but on the airline's "alleged breach of its own, self-imposed undertakings." 513 U.S. at 228. "A remedy confined to a contract's terms simply holds parties to their agreements - in this instance, to business judgments an airline made public about its rates and services." *Id*. at 229. Concluding that plaintiffs' breach of contract claims were not preempted by the ADA, the Court reasoned:

> The ADA's preemption clause, § 1305(a)(1), read together with the FAA's savings clause, stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated. This distinction between what the State dictates and what the airline itself undertakes confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement. . . . The basis for a contract action is the parties' agreement; to succeed under the consumer protection law, one must show not necessarily an agreement, but in all cases, an unfair or deceptive practice.

513 U.S. at 232-33. In short, the Court in *Wolens* concluded that the question of whether American reserved the right, in its agreement with Advantage Club members, to change the rules regarding mileage credits that members had already accumulated (plaintiffs' breach of contract claim) was distinct from the question of whether doing so would be considered an unfair, deceptive or fraudulent act under Illinois law, the latter involving enforcement of a state-imposed obligation and therefore preempted by the ADA.[2]

---

[2] In the instant case, Spirit concedes this distinction and does not argue that Plaintiff's rescission claim (Count I) is preempted. "Of course, any claim based on the breach of parties' self-imposed

12

Plaintiff in the instant case seeks to attack through state consumer protection laws the very type of allegedly deceptive conduct at which the NAAG Guidelines examined in *Morales* were aimed and which the Supreme Court has concluded States were prohibited from attacking through enforcement of their state consumer protection law.   Right or wrong, deceptive or not, the cancellation and refund provisions of the $9 Fare Club, which Plaintiff claims gave her inadequate notice regarding the fact that the value of her membership in the $9 Fare Club would be worth $0 if she cancelled on the first day of the new membership year, undoubtedly are calculated to have an impact on Spirit's "ability to market [its] product, and hence [have] a significant impact upon the fares they charge."   *Morales*, 504 U.S. at 390.   As the Court recognized in *Morales*, "the airlines must be able to place substantial restrictions on the availability of lower priced seats" (which Spirit does in part by limiting membership in the $9 Fare Club through the cancellation and no-refund provisions) and "must be able to advertise the [discount] fares," (which Spirit does through its marketing and membership materials for joining the $9 Fare Club).   *Id.* at 389.   As the Supreme Court emphasized in *Morales*, the airlines will not have "*carte blanche* to lie and deceive consumers," because "the DOT retains power to prohibit" conduct that does not "further competitive pricing."   504 U.S. at 390-91.   Like the plaintiffs in *Wolens*, Plaintiff here challenges Spirit's ability to take certain actions (cancellation without refund) affecting (indeed reducing to $0) the value of Plaintiff's membership in the discount fare club, prohibiting Plaintiff from obtaining discount fares, (access to services) without adequately apprising Plaintiff of the ground rules.   Plaintiff's consumer protection and deceptive trade practices claims clearly complain of conduct that the Supreme Court

---

obligations is governed by applicable and enforceable choice of law provisions.   Spirit agrees with Plaintiff that her claim for Rescission is governed by Florida law, because it is not based on a state-imposed obligation."   (ECF No. 42, Ex. B, Def.'s Reply.)

in *Morales* and *Wolens* concluded could not be enforced through state consumer protection laws.

The Supreme Court in *Morales* instructed that if an action seeking to enforce a state law has "a connection with or reference to airline 'rates, routes, or services,'" the claims are preempted by the ADA. 504 U.S. at 384. In the instant case, the very moniker, "the $9 Fare Club," directly suggests the discount fare Club's prohibited relation to "fares, rates or services." Paragraph 2.1 provides that members "will have access to book special fares on Spirit not available to non-members."

Through its $9 Fare Club, Spirit is addressing the very business dilemma recognized by the Court in *Morales*, i.e. the need to sell as many full fare tickets as possible but at the same time fill their planes, even at steeply discounted rates because even a $9 fare is better than an empty seat. One method that Spirit has chosen to accomplish this business purpose is by entering into agreements with consumers who earn the ability, in exchange for paying an annual fee, to purchase discounted fares that are unavailable to other consumers who are not members of the Club. Like the retroactive application of restrictions on blackout dates and capacity that the plaintiffs complained devalued the mileage credits they had earned in *Wolens*, Plaintiff here claims that application of the cancellation and refund restrictions of the Terms and Conditions for membership in the Club deprived Plaintiff of the full purchasing value of her membership in the $9 Fare Club, unfairly rendering illusory her bargained-for right to twelve months of access to Spirit's reduced fares and restricting her access to discounted fares. As the Court noted in *Wolens*, "the full text of the preemption clause, and the ADA's purpose to leave largely to the airlines themselves, and not at all to the States, the selection and design of marketing mechanisms appropriate to the furnishing of air transportation services," compels the conclusion that Plaintiff's claims regarding the cancellation

14

and refund provisions governing Plaintiff's access to discounted fares are preempted by the ADA.

Plaintiff argues that this case is different from *Wolens*, and that preemption does not apply to bar her consumer protection act claims, because she is not complaining about prices, fares or services but rather about the terms and conditions under which she may purchase discounted tickets at some time in the future. Specifically, at oral argument, Plaintiff's counsel argued that what we have in the instant case is simply a contract, arguably, that says in the future you can buy a ticket under certain beneficial terms. But Plaintiff reads *Wolens* much too narrowly.[3]

The Supreme Court in *Wolens* expressly extended preemption under the ADA beyond the price bargain struck between the parties to "the selection and design of marketing mechanisms appropriate to the furnishing of air transportation services . . . ." 513 U.S. at 823. As particularly relevant to the instant case, the Court noted the intrusive effect of enforcing guidelines that purported to instruct airlines on the language that they could permissibly include in the terms and conditions of their frequent flyer programs:

> The NAAG guidelines highlight the potential for intrusive regulation of airline business practices inherent in state consumer protection legislation typified by the Consumer Fraud Act. For example, the guidelines enforcing the legislation instruct airlines on language appropriate to reserve rights to alter frequent flyer programs, and they include transition rules for the fair institution of capacity controls.

> As the NAAG guidelines illustrate, the Consumer Fraud Act serves as a means to guide and police the marketing practices of the airlines; the Act does not simply give effect to the bargains offered by the airlines and accepted by the customers.

---

[3] Not unimportantly, Plaintiff ignores the fact that she characterizes the terms and conditions of the $9 Fare Club as promising a "future service" when it serves her, i.e. when she is trying to fit her claims under Florida administrative code provisions that address promises to provide future services, but denies that characterization for purposes of opposing Defendant's preemption argument. In any event, whether characterized as relating to rates, routes or services, the terms of the $9 Fare Club are clearly within the ambit of those aspects of the airline business that are subject to preemption under the ADA.

513 U.S. at 823.  Clearly then, to the extent that the enforcement of state consumer protection legislation would purport to police the language utilized by Spirit in marketing and managing its $9 Fare Club, *Wolens* instructs that such claims are preempted by the ADA.  That is precisely what we have here despite Plaintiff's effort to spin this as something different.  Like the mileage credits in *Wolens* (that allegedly were devalued by American's retroactive changes to the terms and conditions of the program and restricted members access to cheap seats), Plaintiff's membership in the $9 Fare Club (that was devalued (to $0) by Spirit's cancellation of her membership pursuant to the Terms and Conditions) and her ability to access discounted fares through continued membership in the $9 Fare Club, is a matter relating to rates, routes and services as defined by the Supreme Court in *Morales* and in *Wolens*. Plaintiff in the instant case was promised beneficial rates and special access to cheap flights through her membership in the $9 Fare Club.  The plaintiffs in *Wolens* were promised beneficial rates and access to low fare seats through their participation in the mileage awards program.  The format is different but the essence of the claim is the same, i.e. the airline's interpretation and application of the terms and conditions of the program adversely affected the customer's ability to qualify for discounted tickets and to access service on cheaper flights.  Despite Plaintiff's counsel's argument to the contrary at oral argument, it was precisely the "arrangements" under which plaintiffs would be entitled to reduced fares, i.e. the terms and conditions of the program, that were at issue in *Wolens*.  As the Supreme Court framed the issue when distinguishing the preempted claims from the non-preempted contract claims: "Did American, by contract, reserve the right to change the value of already accumulated mileage credits, or only to change the rules governing credits earned from and after the date of the change?"  513 U.S. at 234. But it is a far different matter to determine whether the parties agreed to something (not preempted) than to decide

16

whether such an agreement is in any event unconscionable under consumer protection laws (preempted).[4]

In the instant case, Plaintiff's claims under state consumer protection and unfair trade practices laws challenge the very method by which Spirit chooses to market its discount fares and provide airline services through its $9 Fare Club; the claims attack the very business model through which Spirit endeavors to fill every empty seat, as unconscionable. There can be no doubt that requiring Spirit to change its methods "would have a significant impact . . . upon the fares [Spirit] charge[s]" and/or the services it provides. *Morales*, 504 U.S. at 390. As the Supreme Court noted

---

[4] Plaintiff also argues that because *Wolens* permits an action for enforcement of the terms of the parties' contract, this Court should enforce the provisions of the $9 Fare Club that dictate that Florida law will govern and that customer's rights under their home consumer protection laws shall be preserved. So doing, Plaintiff argues, will result in no preemption because the parties agreed to the application of law other than the ADA and specifically to the application of state consumer protection laws. Even Plaintiff concedes, however, that the parties may only contract around federal preemption, if at all, when to do so does not subvert specific federal policies. (ECF No. 38, Pl.'s Resp. 2-3.) "The pertinent question is whether the principles of liability agreed upon by the parties [i.e. application of state consumer protection laws] are inconsistent with the language of [the ADA] or the policies that inform that statute and animate the common law of the statute." *Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133, 1148 (11th Cir. 2001). The Supreme Court in *Morales* and *Wolens* has read the ADA broadly and has concluded that enforcement of consumer fraud law generally is subversive of the overarching goal of the ADA to leave airline regulation not to the States but rather to the airlines themselves, with the oversight of the DOT. *Wolens*, 513 U.S. at 228 n. 4. The Court rejects Plaintiff's argument which would result in a perversion of all that *Morales* and *Wolens* teach, i.e. that the ADA "express[es] a broad pre-emptive purpose," *Morales*, 504 U.S. at 383, "to leave largely to the airlines themselves, and not at all to the States, the selection and design of marketing mechanisms appropriate to the furnishing of air transportation services . . .," *Wolens*, 513 U.S. at 228. Given this Court's conclusion that the conduct complained of in the instant case "relates to rates, routes or services," honoring the choice of law provisions of the Terms and Conditions, would clearly subvert the goals of the ADA as expressly recognized by the Supreme Court in *Morales* and *Wolens*, which clearly hold that general consumer fraud law that seeks to regulate rates, routes or services is preempted by the ADA. *See Allstate Ins. Co. v. My Choice Medical Plan for LDM Technologies, Inc.*, 298 F. Supp. 2d 651, 655 (E.D. Mich. 2004) ("a choice-of-law provision cannot be used to contract around or out of federal law"); *Narte v. All Alaskan Seafoods, Inc.*, 211 F.3d 1274, 2000 WL 237923, at *4 (9th Cir. March 1, 2000) (table case) ("neither state law nor a choice of law clause can defeat federal preemption and federal law").

in *Morales*, finding that Plaintiff's claims are preempted does not give Spirit "*carte blanche* to lie and deceive consumers," because "the DOT retains the power to prohibit advertisements which in its opinion do not further competitive pricing." *Id.* at 390-91.

Accordingly, the Court concludes that Plaintiff's consumer fraud and deceptive practices claims (Counts II and III) are preempted by the ADA and GRANTS Defendant's motion for judgment on the pleadings as to these Counts and DISMISSES these claims.

**B.     Rescission**

The parties agree that Plaintiff's rescission claim is not preempted by the ADA and appear to agree that the rescission claim is governed by Florida law.[5]  A claim for rescission under Florida law requires that a party establish the following "fundamental" requirements to state a claim for rescission:

(1) The character or relationship of the parties;

(2) The making of the contract;

(3) The existence of fraud, mutual mistake, false representations, impossibility of performance, or other ground for rescission or cancellation;

(4) That the party seeking rescission has rescinded the contract and notified the other party to the contract of such rescission;

(5) If the moving party has received benefits from the contract, he should further

---

[5]  Although at oral argument the parties appeared to presume the application of Florida law to Plaintiff's rescission claim, the FAC pleads Count I (Rescission and Restitution) on behalf of a Michigan class and a Nationwide class, and Plaintiff suggests in her response that Michigan law may apply to her rescission claim.  However, the parties did not brief the choice of law issue and the Court implies no ruling on choice of law in this Opinion and Order.  Plaintiff's claim for rescission survives the arguments set forth in Defendant's motion for judgment on the pleadings whether Michigan or Florida law applies.  *See Bayagich v. Rose Twp.*, No. 273642, 2007 WL 1430054, at *6 n. 4 (Mich. Ct. App. May 15, 2007) ("Rescission will also lie in cases involving unconscionable conduct, fraud, or innocent misrepresentation.").

allege an offer to restore these benefits to the party furnishing them, if restoration is possible;

(6) Lastly, that the moving party has no adequate remedy at law.

*Lawyers Title and Escrow, Inc. v. Southern States Investment Corp.*, 198 F.3d 246 (Table), 1999 WL 993932, at *3 (6th Cir. 1999) (citing *Crown Ice Mach. Leasing Co. v. Sam Senter Farms, Inc.*, 174 So.2d 614, 616 (Fla. Dist. Ct. App.1965)).  The essence of Plaintiff's rescission claim is based on fraud or false representation.  Mutual mistake and impossibility of performance have not been alleged.  Thus, to survive Spirit's motion for judgment on the pleadings as to her rescission claim, Plaintiff must at a minimum allege the fundamental element of a falsehood.[6]  Under Florida law, a claim of fraud must at a minimum allege a materially false statement on which the injured party relied to his or her detriment:

> The elements for actionable fraud are (1) a false statement concerning a material fact; (2) knowledge by the person making the statement that the representation is false; (3) the intent by the person making the statement that the representation will induce another to act on it; and (4) reliance on the representation to the injury of the other party.  In summary, there must be an intentional material misrepresentation upon which the other party relies to his detriment.

*Lance v. Wade*, 457 So. 2d 759, 760 (Fla. Dist. Ct. App. 1983).

In the instant case, Plaintiff's Complaint fails to allege clearly on its face a false statement of material fact.  Plaintiff directs the Court to paragraphs 11-15 and 29 of the FAC as support for her argument that she has met the requisite standard for pleading a claim of fraud.  However, a close

---

[6] Plaintiff's reliance on the non-disclosure doctrine set forth in *Johnson v. Davis*, 480 So. 2d 625 (Fla. Dist. Ct. 1985), which permits a claim for rescission based on non-disclosure of material facts affecting the value of property in a residential real estate transaction, is misplaced.  *Johnson* is limited to situations involving the sale of real property and is not applicable here.  *See Billian v. Mobil Corp.*, 710 So. 2d 984, 987 (Fla. Dist. Ct. App. 1998).  *See also Solorzano v. First Union Mtg.Corp.*, 896 So. 2d 847, 849 (Fla. Dist. Ct. App. 2005) (noting that *Johnson's* "application is limited to non-commercial real property transactions.").

19

examination of those allegations reveals that each involves an alleged *failure* to disclose.  Plaintiff

has not identified one statement in the Terms and Conditions that she alleges is false.  There is no

question that the Terms and Conditions state that: (1) once a member cancels, member benefits will

no longer be available unless the member re-enrolls - "Once a Member cancels their membership,

Membership cannot be reinstated; Member must sign up again to receive Club benefits."  (Terms

and Conditions ¶ 3.8.); (2) members are not entitled to a refund of membership fees when they

cancel their membership - "A Member will not be entitled to any refund of any membership fees

upon cancellation of membership in the Club."  (Terms and Conditions ¶ 3.7.); (3) annual

membership fees will be automatically charged and are non-refundable, notwithstanding Member's

cancellation of membership in the Club - "One (1) year after Annual enrollment in the Club, and on

each anniversary thereafter, Members will be automatically charged an annual fee of $59.95 for

membership in the Club.  Annual fees are non-refundable, notwithstanding Member's cancellation

of membership in the Club."  (Terms and Conditions ¶ 3.5.); and (4) Spirit reserved the right to

change the membership fees at any time, with or without notice - "Initial or renewal membership

fees are subject to change by Spirit at any time without notice to the Member.  Any increase in the

annual membership fee will take effect upon renewal of a Member's membership."  (Terms and

Conditions ¶ 3.6.)

Plaintiff does not allege that any of these statements is false.  Indeed, it is precisely because

the Terms and Conditions operate as set forth in the Agreement that Plaintiff complains that they

are unfair and unconscionable.  Plaintiff claims that Spirit should have said more - that Spirit should

have explained in greater detail what the Terms and Conditions actually mean, i.e. be aware of the

date that your membership comes up for renewal and make sure before your renewal date that you

20

are still happy with the amount of the annual fee because if you cancel your membership just after it automatically renews, you will no longer be entitled to member benefits, and you will not be entitled to a refund of the membership renewal fee.  Based upon the Terms and Conditions that were presented to the Court prior to the hearing on this matter, while Spirit's failure to tie together and spell out for consumers the cumulative effects of the admittedly accurate disclosures contained in the Terms and Conditions may violate some other law, it cannot sustain a claim of fraud, which at its most elemental level requires a false representation, not a failure to disclose.

However, at the hearing on this matter Plaintiff, for the first time, argued that the $9 Fare Club Terms and Conditions had been modified by a letter or series of letters that Plaintiff received after she had signed up online for membership in the $9 Fare Club, in which Spirit promised that Plaintiff would receive an email 30 days before her annual renewal warning of any increase in the annual fee.  Plaintiff argued, at the hearing on Defendant's motion, that the Terms and Conditions that Defendant submitted in response to the Court's October 29, 2012 Order to Defendant to produce the relevant Terms and Conditions to which Plaintiff would have agreed, therefore, were incomplete and not accurate.  In essence, Plaintiff argues that the actual 2010 Terms and Conditions, apparently as modified by some documents that Plaintiff claims to have received from Spirit, have yet to be produced to the Court and remain subject to further factual development.

In reviewing the allegations of Plaintiff's Complaint, the Complaint does assert that members of the $9 Fare Club were supposed to receive an email 30 days before their annual renewal date advising them that their annual membership fee was going to be increased.  (Compl. ¶¶ 3-8.) However, the Complaint never makes specific reference to the alleged written modifications that Plaintiff attempted to introduce at the hearing and interestingly, Plaintiff did not make this argument

before Magistrate Judge Randon when Plaintiff's counsel conceded that Plaintiff was not alleging a breach of contract claim.[7]

When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Treesh*, 487 F.3d at 476. Accordingly, because neither party has been able to produce the definitive contract in this matter, and accepting as true the allegations of Plaintiff's Complaint regarding Spirit's agreement to send a pre-renewal email, the Court cannot conclude that Plaintiff has failed to state a claim for rescission. Therefore, the Court will deny Defendant's motion for judgment on the pleadings as to Plaintiff's rescission and restitution claim (Count I).

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that the Plaintiff's MCPA claim (Count II) and FDUPTA claim (Count III) are preempted by the ADA and GRANTS Defendant's motion for judgment on the pleadings as to Counts II and III of the Complaint.

The Court further DENIES Defendant's motion for judgment on the pleadings as to Plaintiff's claim for Rescission (Count I).

IT IS SO ORDERED.

---

[7] In denying Plaintiff's motion to amend to add a claim for breach of the covenant of good faith and fair dealing based upon the allegation that some customer's received "discretionary refunds" of their membership fees, Magistrate Judge Randon noted that Plaintiff had failed to articulate any breach of contract claim and therefore could not assert a failure to carry out the terms of the contract in good faith based upon Spirit's failure to enforce the terms of the contract as to certain other members. Hypothesizing a situation where two tenants are both obligated to $500 per month in rent, Magistrate Judge Randon observed: "Just because your neighbor gets to pay $300 for a particular month, that doesn't diminish the contract you made to pay $500 a month. It may be unfair, but it's probably not a breach of good faith and fair dealing." (ECF No. 41, Tr. Hr'g Feb. 7, 2012, 6-7, 14.)

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  December 5, 2012

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on December 5, 2012.

S/Denise Goodine
Case Manager